PRESENT: All the Justices

SUFFOLK CITY SCHOOL BOARD, ET AL.

                                      OPINION BY
v. Record No. 220116               JUSTICE WESLEY G. RUSSELL, JR.
                                   APRIL 27, 2023
DEBORAH K. WAHLSTROM

FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
Matthew A. Glassman, Judge

Deborah Wahlstrom initiated an action in the trial court contending that the Suffolk City School Board (the "Board"), Board Chair Judith Brooks-Buck, and Superintendent of Schools John B. Gordon III (collectively "defendants") violated the Virginia Freedom of Information Act ("VFOIA"), Code § 2.2-3700 *et seq.*, by denying her free entry to a public meeting of the Board. The trial court entered a judgment awarding Wahlstrom relief against the Board but denying her claims against the individual defendants.

Defendants appeal, contending that the trial court erred in concluding that VFOIA requires that public bodies permit members of the public to be physically present in the room where an open meeting occurs and in the relief it awarded Wahlstrom. In responding to the appeal, Wahlstrom assigned cross-error to the trial court's decision sustaining defendants' demurrer to the potential individual liability of Brooks-Buck and Gordon and its later finding that any violations of VFOIA by Brooks-Buck and Gordon were not willful and knowing. For the following reasons, we affirm the judgment of the trial court.

## I.  BACKGROUND[1]

On July 22, 2021, the Board held a meeting[2] at the College and Career Academy at Pruden ("CCAP"), a Suffolk public school.  The day-long meeting focused on Board training and strategic planning.  In addition to the Board and other relevant city employees, participants in the meeting were to include outside presenters.  Although the nature of the meeting was such that there would be no public comment or Board action taken, it nevertheless was "intended to be a public meeting open to the public[.]"[3]  For this reason, the Board provided the public with notice of the meeting as required by Code § 2.2-3707(C).

---

[1] Because this matter comes to us after a trial of the issues below, we owe deference to the trial court's factual findings and must view the evidence in the light most favorable to the prevailing party below. *American Tradition Inst. v. Rector & Visitors of the Univ. of Va.*, 287 Va. 330, 338-39 (2014).  Here, Wahlstrom prevailed on her claim against the Board, but Brooks-Buck and Gordon prevailed on the claims against them as individuals.  Accordingly, we state the evidence that pertains to Wahlstrom's claim against the Board in the light most favorable to her, granting her all reasonable inferences that flow from such a view of the evidence.  We therefore state the evidence as it pertains to the events that occurred at the meeting in the light most favorable to Wahlstrom.  However, as it pertains to Wahlstrom's claims against Brooks-Buck and Gordon as individuals, Brooks-Buck and Gordon were the prevailing parties based on the trial court's conclusion that their actions did not constitute willful and knowing violations of VFOIA.  Thus, as it pertains to the claim that they acted consistent with their training and the advice of counsel, we view that evidence in the light most favorable to Brooks-Buck and Gordon, granting them all reasonable inferences that flow from such a view of that evidence.

[2] The parties use "meeting" and "retreat" interchangeably throughout the record to refer to the July 22, 2021 event.  For the purpose of VFOIA, "meeting" is a defined term, *see* Code § 2.2-3701, which indisputably encompasses the event.  We therefore use the term "meeting" for clarity.

[3] VFOIA defines "meetings" to include "work sessions, when sitting as a body or entity, or as an informal assemblage of . . . as many as three members . . . of the constituent membership, wherever held, with or without minutes being taken, whether or not votes are cast, of any public body[,]" and defines "public meeting" as "a meeting at which the public may be present."  *See* Code § 2.2-3701.

Wahlstrom saw the notice and meeting agenda posted on the Board's website and decided to attend because she was interested in the topics being covered that day. Although the Board records its meetings and posts them publicly on YouTube "as a matter of practice[,]" Wahlstrom opted to attend the meeting in person so she could observe the Board members' "facial gestures" and "how they interact with each other." She noted that attending in person would allow her to observe the "many nuances . . . that you don't see if you're not in" the room.[4] The Board advertised the meeting as a public meeting, giving no indication that members of the public would not be allowed to attend the meeting in the same room as the Board or that there would be other special rules or restrictions for citizens.

Typically, the Board holds its open meetings at Suffolk's City Hall, but Board meetings have been held at other locations such as school auditoriums and band rooms on occasion. In this instance, two of the outside presenters were scheduled to make their presentations virtually, but specifically requested that each be able to see, hear, and engage with participating Board members. Because the cameras in the city council chamber were in the process of being replaced, making such interaction impossible, the Board sought an alternative venue.

The Board ultimately settled on a classroom at CCAP over other school auditoriums, band rooms, cafeterias, or larger spaces. Though the Suffolk school district owned approximately 400 portable camera systems identical to the one used at the July 22, 2021 meeting, audio quality varied considerably depending on the size of the room. The room thus needed to be big enough to fit the in-person attendees—to include seven Board members, the

---

[4] Despite its normal practice, the Board elected not to record or upload this particular meeting to YouTube for public viewing.

3

Superintendent, 11 members of the Superintendent's cabinet,[5] the Board Clerk, the Deputy Clerk, and the Board Attorney—but small enough to avoid sacrificing audio quality for the virtual presenters. In addition to being smaller and thus more audio-friendly, the CCAP classroom came equipped with a camera, microphones, whiteboards, and extra display screens.

When the Board decided on CCAP as the meeting venue, it "also made plans to have a separate seating area for the public[.]" Although the Governor's Executive Orders relating to COVID protocols had expired on July 1, 2021, the Board arranged for the room to be set up so that, for the most part, the Board and associated staff could "be socially distanced six feet apart." For the bulk of the meeting, the Board and associated staff were to be seated one person to a table, each spaced a minimum of six feet apart; however, the set-up included three additional "breakout tables" for small group activities. The breakout tables were used for an "icebreaker" activity during the morning session that lasted approximately 15 minutes. Photographic evidence demonstrated that, during that session, groups of unmasked attendees surrounded the breakout session tables and were within six feet of one another.

Although setting up the room in this fashion reduced the room's capacity, there remained sufficient space for at least some socially distanced public seating. Rather than set up some public seating in the room, the Board instead planned for all public viewing of the meeting to occur virtually in a separate, designated space within the building.

To advance this plan, the Suffolk Public Schools' Director of Technology (the "IT Director") set up a camera feed from the meeting room to a large projector screen in the CCAP lobby, where members of the public were allowed to sit and view the meeting in real time. Two

---

[5] Gordon, as Superintendent of Schools, required members of his cabinet to attend meetings of the school board "because it's their field of expertise" and "to be present in case the [B]oard has a question that specifically I may not be able to answer."

4

rooms adjacent to the lobby were also reserved for public viewing in case of overflow. The IT Director, who attended the meeting in the actual meeting room, controlled the camera feed to the lobby throughout the meeting. He was able to manipulate the cameras and resulting display by zooming in and out, focusing on individual speakers, or showing the whiteboard when it was in use. As a result, he ultimately determined what the public could see on the video feed at any given time.

On the morning of July 22, 2021, Wahlstrom arrived at CCAP and, seeing no signage indicating a separate seating area for the public, proceeded to the room where the meeting was to take place. She entered the meeting room and sat down at one of the round tables but was told that the tables were reserved for staff. In response, she took down a chair from a stack of unused chairs against the wall and sat there instead. The chair was more than six feet away from the tables and chairs set out in the room for the Board and associated staff.

At some point, Wahlstrom was told that members of the public were not permitted in the meeting room and could only view a video feed of the meeting from a different location within the building. Wahlstrom believed and asserted that VFOIA gave her the right to attend the meeting in the room with the Board. At no time on July 22, 2021 did anyone present Wahlstrom with any statute, rule, regulation, or policy to refute Wahlstrom's claim. Similarly, no one cited any COVID safety protocols or considerations to explain why members of the public were being excluded from the meeting room, and there was no signage or announcement at CCAP concerning COVID rules for the July 22, 2021 meeting.

Wahlstrom testified that Brooks-Buck approached her and, despite the meeting having been publicly noticed as an open meeting, told her "[y]ou can't be in here" because "[t]his is a closed meeting." Shortly thereafter, Brooks-Buck and Gordon instructed Wahlstrom to exit the

room and return to the lobby. Wahlstrom refused, asserting that VFOIA permitted her to be present in the room during the Board's open meeting.

Wahlstrom admits she grew angry during her conversation with Brooks-Buck and Gordon. However, her verbal disagreement with Brooks-Buck and Gordon remained relatively quiet. Board member Sherri Story testified that the conversation was "very calm and quiet," to the point that she was unable to hear what was being said despite being present in the room. Similarly, the IT Director testified he did not recall hearing or observing "anything in particular" about Wahlstrom's behavior despite his presence in the room.[6]

The back-and-forth between Wahlstrom and Brooks-Buck and Gordon led to Gordon threatening to call the police if Wahlstrom would not return to the lobby. Wahlstrom remained in the room, and the police were called. The police arrived, and, as Gordon walked the officer back to the meeting room, he explained that Wahlstrom was "an enemy of the school division" and was "refusing to leave." Consequently, the officer escorted Wahlstrom out of the building. In the parking lot, the officer told Wahlstrom "you have to leave [the entirety of] the property[,]" which Wahlstrom promptly did. Accordingly, Wahlstrom was unable to view the meeting even virtually.

Wahlstrom filed a complaint in the Circuit Court of the City of Suffolk against the Board and Brooks-Buck and Gordon, individually and in their official capacities as a Board Member

---

[6] Certain witnesses testified that Wahlstrom was belligerent, disruptive, and viewed by some Board members and staff as posing a threat. The testimony of Wahlstrom, Story, and the IT Director as well as the police body camera footage that was introduced at trial belie these characterizations. In any event, because Wahlstrom is the prevailing party on the pertinent issue, the standard of review requires us to accept Wahlstrom's version of events and reject claims that she was loud, belligerent, threatening, or disruptive. *See American Tradition Inst.*, 287 Va. at 338-39.

and Superintendent of Schools,[7] respectively.  In her complaint, Wahlstrom alleged primarily that defendants violated VFOIA's open meeting provisions by excluding her from the meeting room where the Board's July 22, 2021 open meeting took place.  She further alleged that the Board's public notice of the meeting did not state "any limitations or restrictions relating to the general public's ability to attend this particular meeting[,] . . . nor were any restrictions or limitations listed on the Public Agenda[.]"  Wahlstrom asked for mandamus and/or injunctive relief against defendants to mandate compliance with VFOIA and prevent further violations.  She also asked for attorney fees and costs and any other appropriate relief, to include civil penalties against Brooks-Buck and Gordon.

Defendants filed a demurrer to Wahlstrom's complaint, requesting "that the allegation contained in the Verified Complaint . . . be dismissed with prejudice" for two reasons.  First, defendants argued that there was no VFOIA "notice" violation because Code § 2.2-3707(C) requires public bodies to give the public notice only of the "time, date, and location" of a public meeting, which the Board did.  Second, defendants asserted that the pertinent provisions of VFOIA do not apply to defendants "individually" because an individual cannot be a "public body" as defined in Code § 2.2-3701.  After hearing arguments on the demurrer, the trial court overruled the demurrer as to any alleged notice violation but sustained it as to Brooks-Buck and Gordon's potential liability as individuals, dismissing them in their individual, as opposed to official, capacities.

---

[7] In the caption of her complaint, Wahlstrom erroneously referred to Gordon as "Superintendent of the Suffolk City School Board" but, in the body of the complaint, refers to him as "Superintendent of the Suffolk City Schools[.]"  His official title is "Superintendent of Suffolk City Public Schools."

7

At trial, Brooks-Buck and Gordon were called as witnesses by Wahlstrom in her case-in-chief. In addition to testifying as to their version of the events of July 22, 2021, both testified that they had received training on VFOIA and advice from counsel, that they believed no VFOIA violations took place on July 22, 2021, that their understanding was that VFOIA only required that the public be allowed virtual access to meetings and did not require that the public be permitted to be in the room with the Board during a meeting, and that they agreed with the decision to have police remove Wahlstrom from CCAP. Gordon acknowledged that the decision to have police remove Wahlstrom from CCAP was "willful and intentional and deliberate[,]" and Brooks-Buck testified that, consistent with her belief that no VFOIA violation had occurred, nothing "procedurally or in terms of protocols . . . need[ed] to be changed to comply with [V]FOIA" at future Board meetings.

Wahlstrom also called Story as a witness. In addition to detailing her observations of Wahlstrom's interactions with Brooks-Buck and Gordon, Story testified regarding her understanding of VFOIA and her response to the decision to have Wahlstrom removed from the meeting by police. She testified that, before her election to the Board, she had attended, in person, a prior Board retreat that occurred in the very same room as the July 22, 2021 meeting. Because of this experience, she had assumed that the general public could attend the July 22, 2021 meeting in person.

Story, as a member of the Board, also testified that she believed Wahlstrom, as a member of the general public, had a right to be in the room during the meeting and that the decision to deny her that right and have her removed "violated" the open meeting requirements of VFOIA. She testified that she made others aware of her view on July 22, 2021. Specifically, Story testified that, after the police had been called, she approached Brooks-Buck and "spoke directly

8

to her begging her not to do this because I felt it was a [V]FOIA violation." She indicated that she asked Brooks-Buck not to remove Wahlstrom on multiple occasions that day and told Brooks-Buck the "Board [is] going to end up in court again. Please don't do this."[8]

After Wahlstrom concluded her case-in-chief, defendants moved to strike. The trial court granted the motion "as to the allegation that the notice of the open meeting was inadequate under the circumstances presented" but otherwise denied it.

Defendants called witnesses during their case who testified regarding the events of July 22, 2021. At the conclusion of their evidence, defendants renewed their motion to strike, which the trial court denied.

Issuing rulings from the bench that were later memorialized in a written order, the trial court concluded that the Board violated VFOIA's open meeting requirements by denying Wahlstrom "free entry" into the July 22, 2021 meeting. Notably, the court found that "Wahlstrom was a citizen and a member of the public, [so] she was entitled to be present[,]" but the Board's plan for the meeting "gave no weight or consideration to the public being in the room." Regarding the Board's decision to have Wahlstrom removed from the property by police, the trial court found that it was "shameful that . . . a citizen was threatened with arrest for trying to assert her rights to be in" the meeting room.

---

[8] Story's statement that the Board was likely "to end up in court again" is an apparent reference to prior VFOIA litigation that Story brought against the Board. Specifically, she stated that previously she had brought suits against the Board alleging that it had failed to comply with VFOIA. We heard one of those cases. *See Suffolk City Sch. Bd. v. Story*, Record No. 201334, 2022 WL 175607 (Va. Jan. 20, 2022) (unpublished). Although we reversed some of the trial court's findings that the Board had violated VFOIA, we did not reverse all of them and noted that it was "undisputed that the Board committed multiple VFOIA violations" in that case. *Id.* at *3.

The trial court accepted defendants' argument that CCAP was the only suitable place for the meeting, but found no "reason to exclude the public from being present in the venue room[.]" It found "that the plan could have been altered to accommodate the public in the room at CCAP" since "the evidence was there were only two [members of the public] that were there, and there was enough room to accommodate those people in that room." Furthermore, although the Board claimed it had COVID-related concerns, the evidence established that meeting attendees were not masked, did not maintain social distancing, and that COVID concerns did not require that the public be excluded from the meeting room.

Turning to remedy, the trial court enjoined the Board from "designing any retreat that bars the public from entry or being present in the venue room." The trial court declined to impose civil penalties on Brooks-Buck or Gordon pursuant to Code § 2.2-3714, reasoning that any violation of VFOIA was not "willful and knowing" because "they were trained and received counsel that access equals entry." In declining to order civil penalties in this case, the trial court referenced the Board's prior history of VFOIA violations and issued a warning, stating, "that this is the second time this court has rendered a verdict of a [V]FOIA violation, and the defense of relying on counsel may not be enough in the future. Something needs to change." The trial court then ordered the parties to appear at a later hearing to address Wahlstrom's claim for attorney fees and costs.

The parties reconvened, and the trial court took evidence and heard argument on the issue of attorney fees. Finding that Wahlstrom "substantially prevailed on the merits of the case[,]" the trial court awarded her a total of $19,503.56. In explaining its decision to award attorney fees, the trial court once again characterized the Board's conduct towards Wahlstrom as "shameful[,]" stating from the bench "Wahlstrom was prejudiced in the fact that she was

10

removed from the meeting room and actually told to leave the premises under the threat of arrest. And the court concluded that that conduct, in fact, was shameful." The trial court rejected the Board's argument that "awarding attorney[] fees would be unjust." In doing so, the trial court noted its concern that not awarding fees would result in "a chilling effect on people bringing these type of actions in the future" and that "general members of the public would not be able to bring these suits" if fees were not available.

Defendants noted an appeal to this Court, advancing six assignments of error. The first three address the trial court's finding that the Board violated VFOIA's open meeting requirements on July 22, 2021. In the remaining three assignments of error, defendants assert the trial court erred in granting an injunction and in awarding Wahlstrom attorney fees and costs. In response, Wahlstrom assigned cross-error, arguing that the trial court "erred in sustaining the demurrer to the individual potential liability of" Brooks-Buck and Gordon and "erred in failing to find willful and knowing violations" of VFOIA by Brooks-Buck and Gordon.

## II. ANALYSIS

### A. Standard of review

Most of the issues raised by the parties on appeal involve the meaning of specific provisions of VFOIA, and thus, present questions of law subject to de novo review in this Court. *Transparent GMU v. George Mason Univ.*, 298 Va. 222, 237 (2019). In interpreting VFOIA, we remain cognizant that the General Assembly enacted VFOIA to "ensure[] the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees, and free entry to meetings of public bodies wherein the business of the people is being conducted." Code § 2.2-3700(B). VFOIA guarantees such "ready access" and "free entry" because "[t]he affairs of government are not intended to be conducted in an atmosphere of

11

secrecy since at all times the public is to be the beneficiary of any action taken at any level of government." *Id.* Accordingly, VFOIA must "be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government" and no "meeting [shall be] closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." *Id.* We previously have recognized that this VFOIA-specific rule of construction "puts the interpretative thumb on the scale in favor of" open government and public access. *Fitzgerald v. Loudoun Cnty. Sheriff's Off.*, 289 Va. 499, 505 (2015). To the extent that the proper application of VFOIA's requirements turns on the specific facts of the case, we owe deference to the trial court's factual findings, *American Tradition Inst. v. Rector & Visitors of the Univ. of Va.*, 287 Va. 330, 338 (2014), unless "they are 'plainly wrong or without evidence to support [them].'" *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 58 (2021) (quoting Code § 8.01-680).

### B. "Free entry to" and being "present" at a meeting

Defendants argue that VFOIA does not require that the public be allowed to be physically present at a public meeting and that any VFOIA obligation a public body owes the public regarding meetings is satisfied if the public body provides a virtual means for the public to view the meeting.[9] At oral argument in this Court, defendants confirmed that their position is that VFOIA allows a public body, if it so chooses, to conduct all of its meetings with no members of the public physically present in the meeting room so long as it provides some method for the public to access electronic video and audio feeds from the meeting. Wahlstrom, pointing to

---

[9] As the record in this case demonstrates, such virtual viewing of a meeting allows a spectator to see what the cameraman decides to broadcast and may not allow the viewer to see the actions or reactions of specific participants in the meeting who are not in view of the camera at particular points during the meeting.

specific language within VFOIA and an advisory opinion issued by the Virginia Freedom of Information Advisory Council ("Advisory Council"),[10] argues that VFOIA requires that the public be allowed to be present in the meeting room during public meetings.

As noted above, VFOIA's purpose is to increase transparency in government. It does so regarding meetings of public bodies by requiring that, in general, meetings of public bodies be open to the public, providing that, absent the invocation of a statutory "exemption . . . , every meeting shall be open to the public" and no "meeting [shall be] closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law." Code § 2.2-3700(B). To advance this policy goal, VFOIA provides that "the people of the Commonwealth" are granted "*free entry* to meetings of public bodies wherein the business of the people is being conducted[,]" *id.*, and defines both "'[o]pen meeting'" and "'public meeting'" as "a meeting at which the public may *be present*." Code § 2.2-3701 (emphasis added).

Wahlstrom argues that VFOIA's provisions that the public be granted "free entry to" and the right to "be present" at meetings of public bodies require that members of the public be allowed to attend public meetings in person in the room in which the meeting is being conducted. The trial court concluded that, absent circumstances not present here, the quoted language imposes such a requirement. We agree with the trial court.

In construing VFOIA in general and the pertinent provisions at issue in specific, we give the words chosen by the General Assembly "their plain and ordinary meanings[.]" *GEICO Advantage Ins. Co. v. Miles*, 301 Va. ___, ___, 879 S.E.2d 908, 911 (2022). In affording

---

[10] The Advisory Council was "created as an advisory council in the legislative branch to encourage and facilitate compliance with" VFOIA, Code § 30-178(A), and is authorized to "[f]urnish, upon request, advisory opinions or guidelines, and other appropriate information regarding" VFOIA "to any person or public body[.]" Code § 30-179(1). Such "advisory opinions, while not binding on the Court, are instructive." *Transparent GMU*, 298 Va. at 243.

statutory language its plain and ordinary meaning, we remain cognizant of context.  *See City of Va. Beach v. Board of Supervisors*, 246 Va. 233, 236 (1993).  Applying these principles to VFOIA leads to the conclusion that the General Assembly's language granting the public "free entry to" and the right to "be present" at meetings contemplates physical presence.

In this context, the pertinent dictionary definitions of "free" include "not obstructed or impeded" and "untrammeled by duties or obligations[.]"  Webster's Third New International Dictionary 905 (2002).  In ordinary usage, "entry" means "the act of entering" and "the right or privilege of entering[.]"  *Id.* at 759.  In turn, "enter" is defined as "to go or come into a *material place*:  *make a physical entrance* or penetration[.]"  *Id.* at 756 (emphasis added).  Thus, affording the General Assembly's use of the phrase its plain and ordinary meaning, "free entry" grants the public the ability to make an unobstructed physical entrance into a meeting without the imposition of other duties or obligations.

Similarly, the plain and ordinary definition of "present" also suggests an actual, physical component.  "Present" means "being in one place and not elsewhere:  being within reach, sight, or call or within contemplated limits:  being in view or at hand:  being before, beside, with, or *in the same place as someone or something*."  *Id.* at 1793 (emphasis added).  Particularly appropriate here and underscoring that "present" generally conveys a physical state, the example sentence accompanying the definition quoted above is about a meeting:  "both men were [present] at the meeting[.]"  *Id.*  Thus, the plain and ordinary meaning of the words chosen by the General Assembly are consistent with the view that VFOIA affords citizens the opportunity to attend public meetings in person by actually entering into the physical space where the meeting is being conducted.

Such a view of the statutory requirements is consistent with a prior opinion of the Advisory Council. The Advisory Council was asked to provide guidance as to whether a public body, in that case a university's board of visitors, violated VFOIA "by denying entry to a public meeting to certain students." Advisory Council Op. AO-02-13 (Mar. 20, 2013). Approximately twenty students attempted to enter the meeting but were told "that only seven seats would be available and no one would be permitted to stand in the audience." *Id.* According to the requestor seeking the Advisory Council's guidance, "this restriction was contrary to past practice of the [b]oard, which had previously allowed audience members to stand." *Id.* Furthermore, the requestor stated that the university had set up the room to provide far less seating for the public than the venue's capacity allowed. *Id.*

Faced with these facts and VFOIA's reference to "free entry" and the public being "present" at public meetings, the Advisory Council concluded that denying students entry into the room violated VFOIA. Specifically, the Advisory Council noted that "where there was sufficient room for additional people to attend the meeting, but those people were refused entry, even though the meeting itself was not closed pursuant to any exemption[,]" the decision to deny entry to the students "violated [VFOIA's] principle of *free entry to meetings of public bodies wherein the business of the people is being conducted* and the statutory requirement that *[a]ll meetings of public bodies shall be open, except as provided in §§ 2.2-3707.01 and 2.2-3711.*" *Id.* (emphasis in original).

In reaching this conclusion, the Advisory Council determined that VFOIA's granting the public a right to physical entry into a public meeting is not absolute. The Advisory Council noted its view that it is "best practices" for a public body to seek a venue "large enough to accommodate all" the members of the public who wish to attend a meeting and/or provide virtual

15

viewing/participation options for any potential overflow; however, it recognized that, if a large enough room or other alternative means are not available "and a meeting room simply fills to capacity, the fact that other persons are unable to attend would not be a [V]FOIA violation because the public body is not intentionally restricting public access, it is just a consequence of physical limitations of the space available." *Id.* The Advisory Committee also noted its opinion that a public body would violate VFOIA if it "were to move from its regular meeting location to a smaller room in order to avoid public scrutiny on a controversial issue[.]" *Id.*, n.3.

Given VFOIA's purpose, its presumption in favor of transparency, its open meeting requirements, and our interpretation of the phrases "free entry to" and "be present" contained in VFOIA, we largely agree with the Advisory Council. In general, VFOIA affords the public an opportunity to attend public, in-person meetings of public bodies by attending in the room in which the meeting is held. A public body's obligation in this regard is not absolute, but rather, is subject to a rule of reason. Thus, a public body is not required to abandon its traditional meeting place and rent an arena if a topic is likely to generate larger than normal public interest; rather it must provide the "normal" in-person access and take steps to allow members of the public who cannot be accommodated in the meeting room access by other means. Conversely, a public body may not select, design, or arrange a meeting room in a manner that artificially limits or removes the ability of the public to attend in person.

Applying this understanding of VFOIA's requirements to the instant case, it is clear that the trial court did not err in concluding that the Board violated VFOIA by denying Wahlstrom "free entry" into the meeting room on July 22, 2021. Even accepting, as did the trial court, that the room at CCAP was an appropriate venue for the meeting and that the setup of the room with social distancing was appropriate, the Board still violated VFOIA. It is undisputed that the

16

meeting room had sufficient space for every member of the public who sought to attend the meeting to attend it in the meeting room. In fact, it is undisputed that every member of the public who wished to be present in the meeting room could have been admitted to the room and maintained at least six feet of social distancing. As the trial court found, it was not room size, logistics, or COVID precautions that prevented Wahlstrom from attending the meeting in person in the meeting room; it was the fact that, prior to the meeting, the Board decided to deny the public free entry to the meeting room. Thus, the Board violated VFOIA.[11]

---

[11] In the wake of the COVID pandemic, the General Assembly has amended VFOIA on multiple occasions regarding the circumstances when a public body may conduct a public meeting virtually as opposed to in person. *See*, *e.g.*, Code §§ 2.2-3708.2, -3708.3. Although the current versions of those statutes were not in effect on the day the Board excluded Wahlstrom from the meeting, these later adopted provisions may, in appropriate circumstances, inform our understanding of the provisions of VFOIA that were in effect. *See Berry v. Board of Supervisors*, Record No. 211143, 302 Va. ___, ___ n.10 (Mar. 23, 2023) (citing *Prillaman v. Commonwealth*, 199 Va. 401, 406 (1957)).

Defendants argue that the recently enacted provisions of Code § 2.2-3708.3 demonstrate that the General Assembly views in-person and virtual attendance by the public as equivalents that are interchangeable. To support this position, defendants focus on a portion of Code § 2.2-3708.3(A) that provides that "[p]ublic bodies are encouraged to (i) provide public access, both in person and through electronic communication means, to public meetings[.]" When this phrase is viewed in light of the entirety of Code § 2.2-3708.3, as opposed to in isolation as suggested by defendants, it becomes clear that it does not support the idea that in-person and virtual meetings/access are indistinguishable and interchangeable for the purpose of VFOIA.

The overriding purpose of Code § 2.2-3708.3 is to authorize certain public bodies to conduct at least some of their meetings by wholly virtual means even if no state of emergency has been declared. *See* Code § 2.2-3708.3(B) - (D). Despite authorizing *some* public bodies to hold *some* of their meetings virtually, the statute prohibits other public bodies from doing so. Specifically, Code § 2.2-3708.3(C) provides that, absent authority related to declared emergencies found in Code § 2.2-3708.2, "local governing bodies, *local school boards*, planning commissions, architectural review boards, zoning appeals boards, and boards with the authority to deny, revoke, or suspend a professional or occupational license" may not "hold all-virtual public meetings[.]" (Emphasis added.) By doing so, the General Assembly has recognized that there are differences between in-person and virtual meetings, and thus, for the purpose of VFOIA, the concepts are neither indistinguishable nor interchangeable.

17

C. Injunctive relief under VFOIA

The Board next challenges the trial court's decision to enter an injunction enjoining the "Board from designing any . . . Board retreat that bars the public from entry or being physically present in the venue in which any such retreat is conducted[.]" The Board contends this was error, arguing that the trial court did not make express findings that the Board's actions constituted "willful, knowing, and substantial violations of" VFOIA that were likely to "[re]occur in the future" and because "no evidence" before the trial court warranted the entry of an injunction.

In addition to setting forth the obligations of public officials and bodies and the rights of the public, VFOIA makes various remedies available when those duties have been breached and those rights have been violated. *See* Code §§ 2.2-3713, -3714. Pertinent to the trial court's granting of the injunction here, Code § 2.2-3713(A) specifically provides that, when a person has been "denied the rights and privileges conferred by" VFOIA, he or she may seek "to enforce such rights and privileges by filing a petition for mandamus or injunction[.]" Code § 2.2-3713(D) then provides that "[a] single instance of denial of the rights and privileges conferred by this chapter shall be sufficient to invoke the remedies granted herein."

As an equitable remedy, "[a]n injunction is a writ issued in a suit in equity whereby the plaintiff seeks to prohibit the defendant from doing an act . . . or to mandate the defendant to perform a specified act." Kent Sinclair, *Sinclair on Virginia Remedies*, § 51.1[A] (5th ed. 2016). We long have recognized that, in that context, "an injunction is an extraordinary remedy[.]" *Levisa Coal Co. v. Consolidation Coal Co.*, 276 Va. 44, 60 (2008). An equitable injunction has well-known requirements, including that the requesting "party . . . show irreparable harm and the

18

lack of an adequate remedy at law." *Black & White Cars, Inc. v. Groome Transp., Inc.*, 247 Va. 426, 431 (1994).

Such traditional requirements, however, do not apply to statutory injunctions. Rather, "[w]hen a statute empowers a court to grant injunctive relief, the party seeking an injunction is not required to establish the traditional prerequisites, i.e., irreparable harm and lack of an adequate remedy at law, before the injunction can issue." *Virginia Beach S.P.C.A., Inc. v. South Hampton Roads Veterinary Ass'n*, 229 Va. 349, 354 (1985); *see also Levisa Coal*, 276 Va. at 61; *Carbaugh v. Solem*, 225 Va. 310, 315 (1983); *cf. Cartwright v. Commonwealth Transp. Comm'r of Va.*, 270 Va. 58, 66-67 (2005) (VFOIA plaintiff seeking statutorily authorized mandamus remedy need not establish requirements applicable to a traditional mandamus proceeding). Instead, the focus in a proceeding involving a statutory injunction is whether the authorizing "statute or regulation has been violated." *Virginia Beach S.P.C.A.*, 229 Va. at 354.

Although the focus is on whether the statute has been violated and VFOIA permits a trial court to enter an injunction based upon a single violation of VFOIA, Code § 2.2-3713(D), we have never held that the mere finding of a violation *entitles* a petitioner to an injunction. Rather, once a violation of VFOIA has been established, whether an injunction is warranted is a question committed to the trial court's discretion. *Nageotte v. Board of Supervisors*, 223 Va. 259, 269 (1982). In exercising that discretion, a trial court should consider the potential for a future violation of VFOIA. Although VFOIA "permits a trial court to infer from a single violation that future violations will follow[,]" the entry of an injunction remains "extraordinary relief [and] is still predicated on the probability that future violations will occur." *Marsh v. Richmond Newspapers, Inc.*, 223 Va. 245, 258 (1982). An injunction under VFOIA "is not to be casually

19

or perfunctorily ordered[,]" *Nageotte*, 223 Va. at 270, and must be tied to the actual violation of VFOIA that gives rise to injunctive relief.

In crafting a limited injunction that enjoined the "Board from designing any . . . Board retreat that bars the public from entry or being physically present in the venue in which any such retreat is conducted[,]" the trial court did not abuse its discretion. The trial court correctly found that the Board had violated VFOIA by designing the meeting with the intent to deny the public free entry to the meeting. By statute, this violation permissibly gave rise to an inference of potential future violations. *Marsh*, 223 Va. at 258. Such an inference was further supported by the fact that this did not represent a single VFOIA violation by the Board, but rather, was another in a series of VFOIA violations by the Board. *See Suffolk City Sch. Bd. v. Story*, Record No. 201334, 2022 WL 175607, at *3 (Va. Jan. 20, 2022) (unpublished) (recognizing that it was "undisputed that the Board committed multiple VFOIA violations" in that case). Further supporting the trial court's decision was the manner in which the Board violated VFOIA in this case: treating Wahlstrom in a "shameful" manner despite one Board member pleading with the Board not to violate VFOIA in this way. The record supports entry of an injunction, and, by limiting the injunction to preventing the Board from designing another Board retreat with the intent to exclude the public, the trial court's injunction is tied to the violation at issue. Accordingly, the trial court did not err in granting injunctive relief.

Despite the foregoing, the Board argues that the trial court failed to make sufficient findings to support its entry of an injunction. Specifically, the Board contends that, prior to entering an injunction, the trial court was required to expressly find that the Board's violation of VFOIA was "willful and knowing." In support of its argument, the Board cites to our decision in *Hale v. Washington Cnty. Sch. Bd.*, where we stated that a VFOIA injunction "will not be

20

granted unless the court finds that the violation was willful, knowing, and substantial." 241 Va. 76, 81 (1991). Although the Board has correctly quoted from our opinion in *Hale*, our statement in *Hale* does not provide a valid basis for reversing the trial court's decision to grant an injunction in the present case.

First, neither the text of VFOIA nor the quoted language from *Hale* impose a requirement that the trial court expressly find that the violation of VFOIA was willful and knowing. Absent a statutory requirement to make express findings, a trial court is not required to do so. *See Fitzgerald v. Commonwealth*, 223 Va. 615, 627 (1982). As a result, any willful and knowing requirement that can be derived from the language of *Hale* may be satisfied by an implicit finding.

This is significant because, as the Board conceded at oral argument in this Court, the trial court made no finding that the Board's violation was not willful and knowing.[12] Thus, given the standard of review and assuming that the violation must be willful and knowing to support the entry of an injunction, we are required to affirm the trial court so long as there was sufficient evidence to allow a rational factfinder to conclude that the Board's violation was willful and knowing. Given that at least one Board member expressed the view to the others that the Board's actions violated VFOIA as those actions were occurring and the Board still ejected Wahlstrom from the meeting, the evidence was sufficient to support such a conclusion.

---

[12] Although the trial court's injunction runs against the Board and not any individual defendants, the Board notes that the trial court expressly found that, as individuals, neither Brooks-Buck nor Gordon willfully and knowingly violated VFOIA. However, because at least one Board member publicly stated as the events were unfolding that removing Wahlstrom was a violation of VFOIA, it does not follow that the Board, as an entity, did not commit a willful and knowing violation simply because the trial court found that neither Brooks-Buck nor Gordon committed a willful and knowing violation.

Furthermore, we note that the quoted statement from *Hale* is dicta, that is "[i]t was not responsive to the question presented and was not necessary to a disposition of the case." *Deiter v. Commonwealth*, 205 Va. 771, 775 (1965). Specifically, the question before us in *Hale* was whether the trial court correctly sustained a school board's demurrer asserting that the petitioner in that proceeding lacked standing to bring a VFOIA claim. *Hale*, 241 Va. at 78-79. Because the trial court had concluded that the petitioner lacked standing, the question of remedies such as injunctive relief was never reached in the trial court and there was no ruling regarding the standard for granting or denying a VFOIA injunction for us to review on appeal. In that legal context, our discussion of that standard "was not necessary to [the] disposition of the case[,]" *Deiter*, 205 Va. at 775, and therefore, was dicta. As a result, it is not binding on this Court in a case, such as this one, where determining the appropriate standard for granting or denying a VFOIA injunction is necessary to resolve an issue raised on appeal. *See Manu v. GEICO Cas. Co.*, 293 Va. 371, 382 (2017) (citing *Virginia Ry. & Power Co. v. Dressler*, 132 Va. 342, 350-51 (1922)).

Additionally, and perhaps more importantly, the text of VFOIA contains no indication that a violation of VFOIA must be willful and knowing before an injunction may issue. The phrase "willful and knowing" does not appear in Code § 2.2-3713, the section of VFOIA that authorizes injunctive relief as a remedy and governs proceedings brought by a petitioner to enforce his or her VFOIA rights. Significantly, the General Assembly included forms of the phrase in Code § 2.2-3714 and Code § 2.2-3715, portions of VFOIA dealing with the assessment of civil penalties against individual public officials. Specifically, Code § 2.2-3714(A) provides that a trial "court, if it finds that a violation was *willfully and knowingly* made, shall impose upon such officer, employee, or member in his individual capacity*, whether a writ of mandamus or*

*injunctive relief is awarded or not*, a [monetary] civil penalty[.]" (Emphasis added.) In turn, Code § 2.2-3715 provides that, in determining whether an individual public official "committed a *willful and knowing* violation pursuant to § 2.2-3714[,]" a trial court shall admit as evidence relevant opinions of the Advisory Council that might demonstrate that the official "did not *willfully and knowingly* commit the violation[.]" (Emphasis added.) The fact that the General Assembly included the phrase as a requirement in the sections of VFOIA dealing with civil penalties – but did not include it as a requirement in the section dealing with injunctions – leads to the conclusion that there is no such requirement for a VFOIA injunction to issue. The fact that the General Assembly noted in Code § 2.2-3714 that the civil penalties may be awarded whether or not the trial court has granted an injunction underscores the statutory structure in which the civil penalty provision operates independently of injunctive relief, and therefore, there is no reason to believe that the General Assembly intended the requirements for one to apply to the other. Accordingly, we hold that there is no requirement that a trial court make a finding, express or implied, of a willful and knowing violation of VFOIA before it may issue a VFOIA injunction.[13] To the extent that *Hale* can be read to impose such a requirement, we overrule that specific portion of *Hale*.

---

[13] In holding that there is no requirement that the violation of VFOIA be willful and knowing before an injunction may issue, it also is important to note what we do not hold. The fact that a finding of a willful and knowing violation is not required for an injunction to issue does not mean that it is inappropriate for a trial court to consider a public actor's state of mind or intention in determining whether to award injunctive relief. It is appropriate for a trial court to consider whether the violation was willful and knowing along with all of the other evidence in determining whether to exercise its discretion to grant an injunction; however, that information is but a part of the mix, and thus, does not necessarily dictate the outcome one way or the other.

D.  Award of attorney fees and costs to Wahlstrom

Code § 2.2-3713(D) provides that, when a court finds that a public official or public body has denied a person the "rights and privileges" conferred by VFOIA, the person to whom the rights and privileges have been denied "shall be entitled to recover reasonable costs, including costs and reasonable fees for expert witnesses, and attorney fees from the public body if the petitioner substantially prevails on the merits of the case, unless special circumstances would make an award unjust."  Concluding that Wahlstrom "substantially prevailed" in her claims against the Board, the trial court ordered the Board to pay Wahlstrom $19,503.56 to cover the costs and attorney fees she expended to vindicate her VFOIA rights.  The Board argues that the trial court erred, asserting both that the trial court "erred in finding that Wahlstrom substantially prevailed on the merits of her case" and that it "abused its discretion when it applied the incorrect standard and awarded attorney[] fees and costs without ruling on whether special circumstances existed that would make an award of attorney[] fees and costs unjust."  We address each argument in turn.

1.  Substantially prevailed

Acknowledging that Wahlstrom prevailed on some of her claims below, the Board argues that she failed on others.  Specifically, the trial court ruled in favor of the Board on Wahlstrom's claim regarding alleged deficiencies in the public notice for the meeting, and it denied her claim seeking to impose civil penalties on Brooks-Buck and Gordon in their individual capacities.  Defendants contend that these defeats lead to the conclusion that Wahlstrom did not "substantially prevail[] on the merits of the case," and thus, the trial court erred in awarding her fees and costs.  We disagree.

24

By its express terms, Code § 2.2-3713(D) does not require a VFOIA petitioner to prevail on all aspects of his or her claim to be entitled to fees and costs, but only to "substantially prevail[] on the merits of the case[.]"  In this context, "substantial" means "of or relating to the main part of something."  Webster's Third New International Dictionary 2280 (2002).  Thus, to substantially prevail, a litigant need not have achieved all of his or her objectives in the litigation, but rather, must have been successful regarding the main object of his or her suit.  *See Cole v. Board of Supervisors,* 298 Va. 625, 644 (2020); *Hill v. Fairfax Cnty. Sch. Bd.*, 284 Va. 306, 314-15 (2012).

Here, there can be little dispute that the main object of Wahlstrom's action was a determination of whether she was correct that VFOIA's promises of "free entry to" and being "present" at the meeting entitled her to be physically present in the meeting room.  In fact, defendants agreed in the proceedings below that this was the main object of the suit, writing in a pleading that "[t]he *crux* of this action is that there was a violation of [VFOIA] when . . . Wahlstrom . . . was not allowed to be physically present in the same meeting room as members of the Suffolk City School Board . . . during a School Board meeting" and arguing at trial that "the *crux* of [Wahlstrom]'s petition i[s] that . . . the school board violated [V]FOIA by excluding a member—any member of the public from being physically in the same meeting room[.]"[14] (Emphasis added.)  Because this issue represented the main object of her action and Wahlstrom prevailed on the issue, the trial court did not err in concluding that she "substantially prevail[ed] on the merits of the case" for the purpose of an award of attorney fees and costs pursuant to Code § 2.2-3713(D).

---

[14] Pertinent definitions of "crux" include" "a determinative point at issue:  a pivotal or essential point requiring resolution or resolving an outcome" and "a main or central feature[.]" Webster's Third New International Dictionary 547 (2002).

## 2. Special circumstance rendering an award unjust

The Board also challenges the award of attorney fees and costs on the ground that the trial court erred in concluding that there were not special circumstances that rendered the award unjust. In support of this position, the Board asserts that the trial court applied an incorrect standard in resolving the question and additionally proffers various "special circumstances" that it contends rendered the award of fees unjust. Specifically, the Board argues that the fact that some members of the Board believed that they were complying with VFOIA, the fact that the violation of VFOIA did not result in the invalidation of any Board action because "no votes were taken and no decisions [were] made" at the meeting, and the fact that virtual access to the meeting was provided so all members of the public who wished to observe could do so (except for Wahlstrom who the Board had removed from the site) combine to compel a finding that an award of attorney fees and costs was unjust.

In arguing that the trial court applied an incorrect standard, the Board seizes upon a statement the judge made from the bench. Specifically, the Board notes that, in response to its argument that an award would be unjust under the circumstances, the judge stated that he

> believe[d] that if the court were to accept such a ruling, there would be a chilling effect on people bringing these type of actions in the future. In fact, if the court would do that, general members of the public would not be able to bring these suits. It would only be left to the wealthy and to maybe a potential corporation to be able to afford to prosecute such a thing.
>
> Again, the purpose of [V]FOIA is to promote open government. And anyone should be able to bring a suit if they find that there has been and substantially prevail on the merits of the case, should know that—that the attorney[] fees and costs would be covered. So the court finds that not awarding costs and attorney[] fees in this particular case would be unjust.

26

Viewed in isolation, this statement certainly can be read as the Board reads it—that it can never be unjust to award attorney fees and costs to a prevailing party, and therefore, a prevailing party always is entitled to attorney fees and costs. Such a view cannot be reconciled with the text of the statute, and thus, would constitute error.[15]

We do not, however, view a trial judge's statements from the bench in isolation. *See*, *e.g.*, *Coward v. Wellmont Health Sys.*, 295 Va. 351, 363 n.11 (2018) (declining "to 'fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied'") (quoting *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977)). Viewing the record in its entirety suggests the trial court did not reflexively award fees simply because Wahlstrom prevailed in her suit.

Immediately preceding the above-quoted language, the trial court made clear that these comments were in response to the specific arguments the Board raised regarding an award being unjust, as opposed to setting forth a general rule. Specifically, immediately before the above quoted language the judge stated that "the defen[dant] school board argues that awarding attorney[] fees would be unjust," and that his comments were being made as a result of his "look[ing] at that and listen[ing] to the argument that was made by the" Board regarding an award being unjust. With that preface, the trial court's comments are tied to the specifics of the

---

[15] In so holding, we note that a VFOIA plaintiff prevailing on the merits of the case will justify an award in the ordinary case. Prior to 1989, attorney fee awards under VFOIA were discretionary. *See* former Code § 2.1-346 ("the court *may* award costs and reasonable attorney[] fees to the petitioning citizen") (emphasis added). In 1989, the General Assembly removed a court's unbridled discretion, providing that a VFOIA plaintiff who "substantially prevails" "*shall*" be entitled to such an award "unless *special* circumstances would make an award unjust." 1989 Acts ch. 358 (Reg. Sess.) (emphasis added). In this context, "special" means "distinguished by some unusual quality: uncommon, noteworthy, extraordinary[.]" Webster's Third New International Dictionary 2186 (2002). Thus, a VFOIA plaintiff who substantially prevails on the merits of the case is entitled to an award of attorney fees and costs unless unusual, uncommon, noteworthy, or extraordinary circumstances make such an award unjust.

27

case rather than constituting a general rule that the Board claims the trial court erroneously adopted.

Furthermore, viewing the entirety of the record as opposed to the quoted language in isolation, it is clear that the trial court had before it and considered evidence pertinent to a determination of whether an award of attorney fees and costs was "unjust." At both trial and at the additional hearing it held to determine attorney fee issues, the trial court considered and referenced circumstances relevant to such a determination, including the fact that the Board had a recent history of VFOIA violations, the fact that a Board member stated at the time that the Board was violating VFOIA by excluding Wahlstrom, and the fact that the Board had Wahlstrom forcibly removed from the property under threat of arrest in what the trial court referred to as "shameful" treatment of Wahlstrom.[16] Even in light of the Board's proffered reasons for why an award of attorney fees and costs would be unjust, these facts found by the trial court amply support the trial court's finding that such an award was appropriate given all of the circumstances "in this particular case[.]" *See White Dog Publ'g, Inc. v. Board of Supervisors*, 272 Va. 377, 388 (2006) (holding that, even if true, multiple reasons proffered by a board of supervisors were insufficient to constitute "'special circumstances' sufficient to make an award of attorney[] fees and reasonable costs unjust" given all of the circumstances).[17] Accordingly, the trial court's award of attorney fees and costs does not constitute reversible error.

_____

[16] The trial court specifically characterized the Board's conduct as "shameful" at both the trial and the hearing on attorney fees and costs. There is sufficient evidence in the record to support the trial court's characterization of the Board's treatment of Wahlstrom.

[17] Even if we were to accept the Board's invitation to view the trial court's statement in isolation, and thus, conclude that the trial court applied an erroneous standard, the Board still would not be entitled to a reversal of the award because any such error would be harmless. *See Commonwealth v. White*, 293 Va. 411, 420 (2017) ("Code § 8.01–678 makes 'harmless-error review required in *all* cases.'") (quoting *Commonwealth v. Swann*, 290 Va. 194, 200 (2015)). A non-constitutional error is harmless if we can say with confidence that the effect of the error was

E. Individual capacity and civil penalties under VFOIA

We now turn to Wahlstrom's assignments of cross-error. Specifically, she contends that the trial court "erred in sustaining the demurrer to the individual potential liability of" Brooks-Buck and Gordon and "erred in failing to find willful and knowing violations" of VFOIA by Brooks-Buck and Gordon. For the reasons that follow, we conclude that the trial court erred in concluding that VFOIA does not permit civil penalties to be assessed against public officials in their individual capacities, but that such error does not require reversal because, given the standard of review, the record contains sufficient evidence to support the trial court's conclusion that Brooks-Buck and Gordon's violations of VFOIA were not willful and knowing.

1. Individual capacity

VFOIA provides that public officials who violate VFOIA may face monetary civil penalties as a sanction. Specifically, Code § 2.2-3714(A) provides that

> [i]n a proceeding commenced against *any officer, employee, or member of a public body* under [provisions of VFOIA to include the open meeting provisions], the court, if it finds that a violation was willfully and knowingly made, shall impose *upon such officer, employee, or member in his individual capacity*, whether a writ of mandamus or injunctive relief is awarded or not, a civil penalty of not less than $500 nor more than $2,000, which amount shall be paid into the Literary Fund. For a second or subsequent violation, such civil penalty shall be not less than $2,000 nor more than $5,000.

(Emphasis added.)

---

so slight that it would not have altered the outcome. *Swann*, 290 Va. at 201. We have no doubt that, were we to remand the question of attorney fees with instructions that the trial court reconsider whether special circumstances rendered the award unjust, the trial court, given its findings regarding both the violation of VFOIA and the shameful treatment of Wahlstrom as well as the rather ordinary reasons proffered by the Board, would conclude that an award was not unjust.

29

Wahlstrom contends that the plain language of Code § 2.2-3714(A) makes clear that civil penalties may be assessed against individual public officials in their individual capacities. Defendants argued below (and again on appeal) that, despite the language in Code § 2.2-3714(A) regarding civil penalties being imposed on an official "in his individual capacity," VFOIA does not permit a claim for civil penalties against a public "officer, employee or member of a public body in [his or her] individual . . . capacity." Specifically, defendants argued in the trial court that because VFOIA applies to "public bodies" and an individual is, by definition, not a public body, "neither . . . Brooks-Buck nor . . . Gordon can be sued in their 'individual capacity' for having violated the VFOIA because as a single individual, not in their 'official capacities,' they do not meet the definition of a public body under VFOIA." The trial court agreed with defendants; however, given the plain language of Code § 2.2-3714(A), we agree with Wahlstrom.

Fundamentally, the interpretation advanced by defendants fails because it cannot be reconciled with the actual words the General Assembly chose when it enacted Code § 2.2-3714. Although it is true that an individual is not a "public body" as defined in VFOIA, VFOIA recognizes that public bodies act through individuals. Accordingly, Code § 2.2-3714 does not provide for civil penalties to be assessed against a "public body"; rather, it allows for civil penalties to be imposed upon individuals affiliated with public bodies. Specifically, only an "*officer, employee, or member of a public body*" is subject to the imposition of civil penalties under Code § 2.2-3714(A). (Emphasis added.) There is no dispute that Brooks-Buck and Gordon are officers, employees, or members of a public body. Accordingly, as individuals, they are potentially subject to civil penalties for violating VFOIA.

30

Further supporting this conclusion is the General Assembly's direction that civil penalties be "impose[d] upon such [an] officer, employee, or member *in his individual capacity*[.]"  Code § 2.2-3714(A) (emphasis added).  It has long been recognized that, in appropriate circumstances, a suit may be maintained against a public official in his individual capacity for some act related to the official's performance of his duties.  *See Ex Parte Young*, 209 U.S. 123 (1908).[18]

In the more than a century since *Ex Parte Young*, public officials have, depending on the circumstances, been subject to suit in either their official capacities or their individual capacities, with different procedures and immunity rules applying as a result of those circumstances.  Critically, both "official capacity" and "individual capacity" have come to be terms of art as it pertains to suits against government officials and are neither interchangeable nor synonymous.[19]

_____

[18] In *Ex Parte Young*, the United States Supreme Court concluded that the Eleventh Amendment did not bar a suit seeking to enjoin a state official from enforcing a state statute that violated a party's constitutional rights.  209 U.S. at 159-60.  In doing so, it applied what has become known as the *Ex Parte Young* fiction—"an officer executing an unconstitutional statute is stripped of official capacity and may be dealt with as a private wrongdoer[,]" i.e., as someone acting only in his individual capacity despite carrying out a governmental obligation.  John Harrison, *Ex Parte Young*, 60 Stan L. Rev. 989, 995 (2008); *see also Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997) (recognizing the *Ex Parte Young* fiction and that it was premised on the suit being brought "against state officers in their *individual capacities*") (emphasis added); *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 114, n.25 (1984) (noting that *Ex Parte Young* rests on a fictional distinction between the official and the state).  This same reasoning applies here.  A public official's status as a public official places him or her in a position to either honor or violate a citizen's VFOIA rights.  By allowing civil penalties against the official in his or her individual capacity when the official violates VFOIA, the General Assembly effectively strips the official of his or her official capacity (and any associated immunity).

[19] It is clear that, in adopting VFOIA, the General Assembly was aware that "official capacity" and "individual capacity" are distinct concepts.  In identifying who may bring a VFOIA enforcement action under Code § 2.2-3713, the General Assembly included "the attorney for the Commonwealth *acting in his official or individual capacity*[.]"  (Emphasis added.)  If the General Assembly understood the terms to be interchangeable or synonymous, the italicized language would be wholly superfluous.  *See Jones v. Conwell*, 227 Va. 176, 181 (1984) (recognizing that "rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious, or absurd").

31

As defendants conceded at oral argument in this Court, their proffered construction requires "individual capacity" in Code § 2.2-3714(A) to be interpreted as if it read "official capacity." Because such an interpretation of the statute cannot be reconciled with the actual words chosen by the General Assembly, it was error for the trial court to adopt it. *Commonwealth v. Amerson*, 281 Va. 414, 421 (2011) (recognizing that courts "'must determine the legislative intent by what the statute says and not by what [the court] think[s] it should have said'") (quoting *Virginian-Pilot Media Cos., LLC v. Dow Jones & Co.*, 280 Va. 464, 469 (2010)). Accordingly, the trial court erred in sustaining defendants' demurrer to Wahlstrom's claim that civil penalties be imposed upon Brooks-Buck and Gordon in their respective individual capacities.

Our conclusion that the trial court erred in sustaining the demurrer does not necessarily require reversal. As with any trial court error, it is subject to harmless error review. *See Commonwealth v. White*, 293 Va. 411, 420 (2017) (citing Code § 8.01-678). Here, the trial court did not dismiss the civil penalties portion of Wahlstrom's suit when it sustained the demurrer, but rather, allowed it to proceed against Brooks-Buck and Gordon assuming that civil penalties could be assessed against them in their official capacities if the evidence established that their violations of VFOIA were willful and knowing. Ultimately, the trial court concluded that their violations were not willful and knowing. Because such a finding would preclude the imposition of civil penalties even if the trial court had correctly interpreted the phrase "individual capacity" in Code § 2.2-3714(A), we turn to whether the trial court erred in so finding.

### 2. Willful and knowing violation

For a public official to be subject to civil penalties for violating VFOIA, the official's violation of VFOIA must have been "willfully and knowingly made[.]" Code § 2.2-3714(A). Accordingly, a petitioner seeking the imposition of civil penalties must not only establish that a

public official violated VFOIA; he or she also must establish that the official committed the violation with the requisite state of mind, i.e., the conduct was both willful and knowing. The party seeking to impose civil penalties bears the burden of proving, by a preponderance of the evidence, that the violation of VFOIA was willfully and knowingly made. *RF & P Corp. v. Little*, 247 Va. 309, 317-19 (1994).

For the purpose of VFOIA, we have recognized that a public official's "[c]onduct is 'willful' when it is intentional." *Id.* at 320. Such conduct is knowing when the official acts with "'knowledge of the essential facts from which the law presumes a knowledge of the legal consequences arising therefrom.'" *Id.* (quoting *Gottlieb v. Commonwealth,* 126 Va. 807, 810 (1920)). That is, for a VFOIA violation to be "knowingly made," Code § 2.2-3714(A), the public actor must be aware of the obligations imposed by VFOIA and that his or her actions likely violate those obligations. In considering whether a public official acted with the requisite mental state, the trial court may consider any training and advice that the public official has received regarding VFOIA and must admit into evidence "a copy of [any] relevant advisory opinion issued" by the Advisory Council if such an opinion is offered. Code § 2.2-3715.

Whether a public official's violation of VFOIA was "willfully and knowingly made," Code § 2.2-3714(A), is a question of fact. Accordingly, even if we would have reached a different conclusion in the first instance, "the trial court's decision will be upheld unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it." *Little*, 247 Va. at 319. Wahlstrom argues that the evidence conclusively established that Brooks-Buck and Gordon willfully and knowingly violated her rights under VFOIA. We disagree.

33

Even accepting that the evidence established that the actions taken by Brooks-Buck and Gordon were intentional, and thus, were willful for the purpose of Code § 2.2-3714(A), the evidence did not require a rational factfinder to conclude that Brooks-Buck and Gordon knowingly violated VFOIA. Brooks-Buck and Gordon testified that, based on their training, it was their understanding that the Board's VFOIA obligation was satisfied by providing the opportunity for the public to view the meeting by virtual means, and therefore, they believed they were not violating Wahlstrom's VFOIA rights. Gordon also testified that this view was consistent with advice he had received from counsel.

To the extent that this testimony is believed, it establishes that Brooks-Buck and Gordon's violations of VFOIA were not "knowingly made" for the purpose of Code § 2.2-3714(A). The trial court, in its role as factfinder, believed this testimony. Because the trial court reached this conclusion based upon evidence heard "ore tenus, its findings based on an evaluation of the testimony are entitled to the same weight as those of a jury." *Little*, 247 Va. at 319. In reaching its conclusion, "the trial court [wa]s the judge of the credibility of the witnesses[,]" and thus, we defer to its credibility determinations. *Id*. at 321. Accordingly, the trial court did not err in concluding that civil penalties should not be imposed upon either Brooks-Buck or Gordon for their violations of VFOIA.[20]

---

[20] In arguing that the trial court erred in finding that the violations were not knowingly made, Wahlstrom argues that "there is no competent or clear evidence in the record to support that finding." She notes that the witnesses offered no written training materials, Advisory Council opinions, or written advice from an attorney to substantiate their testimony. This argument ignores that the testimony of a witness alone can constitute sufficient evidence to establish any particular fact in issue. *See, e.g.*, *Tyler v. Commonwealth*, 73 Va. App. 445, 462 n.13 (2021) (recognizing that "[t]he testimony of one witness in whom the [factfinder] has confidence may constitute a preponderance" of the evidence) (quotation marks and citations omitted). Thus, even in the absence of documentary evidence that would have supported the testimony, the trial court's conclusion finds sufficient support in the testimony of Brooks-Buck and Gordon.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed and remanded.*[21]

---

Faced with the foregoing, Wahlstrom contends that the trial court should not have considered testimony regarding the training received by Brooks-Buck and Gordon because it amounted to a "form of [an] 'advice of counsel' defense," which had not been pled. However, the testimony on which the trial court relied came into evidence without objection. In fact, the testimony was elicited by Wahlstrom's counsel, and Wahlstrom never objected to the responses, asked that they be admitted for a limited purpose, or sought to have the testimony stricken. Accordingly, it was before the trial court and could be considered for any relevant purpose. *See*, *e.g.*, *TransiLift Equip., Ltd. v. Cunningham*, 234 Va. 84, 91-92 (1987); *Meyer's Sons v. Falk*, 99 Va. 385, 388 (1901). Thus, even if we assume that defendants should have pled that they intended to rely on the advice of counsel and their training as a defense, Wahlstrom waived any such argument when she failed to contemporaneously object to the testimony.

[21] We remand for the limited purpose of having the trial court determine the amount of attorney fees and costs that Wahlstrom reasonably incurred on appeal. She has requested such fees and costs and, as noted above, is entitled to such an award pursuant to Code § 2.2-3713(D).